# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
Assigned on Briefs at Knoxville May 15, 2012

## STATE OF TENNESSEE V. STEVEN WOODROW JOHNSON

**Appeal from the Criminal Court for Davidson County**
**No. 2010-B-977     Mark J. Fishburn, Judge**

---

**No. M2011-00859-CCA-R3-CD - Filed September 7, 2012**

---

Following a trial, a Davidson County jury found appellant, Steven Woodrow Johnson, guilty of felony murder, especially aggravated burglary, aggravated burglary, aggravated assault, and possession of a firearm during the commission of a dangerous felony. The trial court sentenced appellant to life in prison for felony murder. The trial court also sentenced appellant to serve sentences of ten years for especially aggravated burglary (count two) and five years for aggravated burglary (count four) and then merged the two convictions. Appellant was sentenced to five years for aggravated assault and three years for possession of a firearm during the commission of a dangerous felony. Some sentences were consecutive to each other, but all were concurrent to the life sentence for felony murder. Thus, appellant received an effective life sentence. On appeal, appellant contends that the evidence was insufficient to support his convictions. Following review of the record, we conclude that the conviction of especially aggravated burglary should be modified to aggravated burglary. Because only one judgment of conviction should have been entered as to the merged counts, we vacate the judgments in count two and count four and remand to the trial court for entry of a single judgment of conviction consistent with this opinion. We affirm the judgments of the trial court in all other respects.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed in Part; Modified in Part; Vacated in Part; Remanded**

ROGER A. PAGE, J., delivered the opinion of the court, in which THOMAS T. WOODALL and NORMA MCGEE OGLE, JJ., joined.

Paul J. Walwyn, Madison, Tennessee, for the appellant, Steven Woodrow Johnson.

Robert E. Cooper, Jr., Attorney General and Reporter; Clark B. Thornton, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Janice Norman and Robert McGuire, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

I.  Facts and Procedural History

A Davidson County Grand Jury indicted appellant for first degree felony murder, especially aggravated burglary, attempted especially aggravated robbery, aggravated burglary, aggravated assault, and possession of a firearm during the commission of a dangerous felony.  The jury found appellant guilty on all counts except attempted especially aggravated robbery, and he received an effective life sentence.

At the jury trial, Officer Eric Bacon with the Metropolitan Nashville Police Department testified that in the early morning hours of November 23, 2008, he responded to a shooting call at a residence located at 524 Wesley Avenue in East Nashville.  Upon entering the residence through the front door, Officer Bacon briefly spoke with George Young,[1] the victim's roommate and brother.  He then went to the rear bedroom where the victim, John Young, was "near death," lying on the bed with a gunshot wound to his head.  Upon entering the bedroom, Officer Bacon discovered a revolver on the floor next to the victim's foot and secured it.  Paramedics soon arrived to transport the victim, and Officer Bacon was able to conduct a walk-through of the residence.  He observed that the back door had been forced open, shell casings were scattered on the floor, and bullet holes were in the walls.

George M. Young, Jr. testified that he resided at 524 Wesley Avenue with the victim. On the night of November 22, 2008, they watched a football game and went to bed around 10:30 p.m.  A few moments later, Mr. Young heard a knock at the back door.  The victim went to the bathroom window through which he could see two men standing on the back porch; Mr. Young stood beside the victim. The victim told the two people to leave, and they complied.  From the front door of the residence, Mr. Young then observed the two men walking west down the street.  The victim told Mr. Young that the men stated that

---

[1]  Because John and George Young have the same surname, we will refer to George Young as "Mr. Young" and John Young as "the victim" to avoid confusion.  In doing so, we intend no disrespect.

"Dewayne" sent them to borrow money. After Mr. Young returned to bed, a noise in the home awakened him, and he discovered a man in his room, pointing a gun at his face. The man told him to get up. When Mr. Young stood up, the man hit him in the back of the head with his gun, knocking him to the floor. Gunshots began to ring out, and Mr. Young lay face down on the floor. Mr. Young then heard glass breaking, which the shooter caused by jumping through the bedroom window. Mr. Young called 9-1-1 and called out to his brother. However, he "never could hear anything." Mr. Young testified that he kept some money in the back of his closet, but the intruder did not take anything from the home that night.

Richard Allen testified that he resided at 308 Dinwiddie Drive with Robert Taylor and Mr. Taylor's wife, Crystan Shawn Taylor.[2] On the evening of November 22, 2008, Allen was in possession of Crystan's cellular phone. He received a call from appellant in which he asked if Allen "wanted to go out and do something." Appellant thereafter drove to Allen's residence with appellant's brother, Richard Johnson, and another man whom Allen had never met before. The men all got into appellant's vehicle, and Allen had a conversation in the back seat of the vehicle with the man whom he did not know. Allen testified that the man "[w]anted to hit a lick. They were going to do a robbery." Allen stated that the man wanted $60,000 that was in a shoe box in the home of "two old guys." Allen was not certain if appellant could hear the conversation, but Allen asked appellant what he thought about the conversation. However, Allen could not recall how appellant replied. Allen then stepped out of the vehicle and returned to his house, not wanting to participate in the robbery. Allen left instructions with Crystan "to just answer the phone and say no[,]" if appellant called. Allen and Robert Taylor then left the residence to go to a tattoo shop. After hearing about the home invasion and murder on the news, Allen contacted appellant the next day and asked appellant if he had been involved. Appellant responded that he had no involvement in the reported incident.

Crystan Shawn Taylor testified that on November 22, 2008, Allen was in possession of her cellular phone at their residence while she was at a tattoo shop with a friend. When Crystan returned home, Allen was leaving the residence with Robert Taylor, and Allen stated to Crystan that "Woody[3] may call. If he calls, tell him I'm not here and I said no." After midnight, Crystan received a call from appellant, asking for "Ricky."[4] Crystan responded

---

[2] Numerous witnesses in this case share the same surname. To avoid confusion, we will sometimes refer to the witnesses by either their first or last names. In using first names, we intend no disrespect.

[3] "Woody" obviously referred to appellant, Steven Woodrow Johnson.

[4] "Ricky" obviously referred to Richard Allen.

that "Ricky said to tell you he's not here and he said no," although she did not know the meaning of her response. Appellant then replied, "[T]hat's all I need to know."

Alicia Catherine Johnson, appellant's wife, testified that in 2008, she and appellant resided with appellant's parents in their home at 1221 London Bridge Road. Appellant's brother, Richard Johnson, also resided there. She stated that she and appellant were arguing constantly, and their marriage was "falling apart." On the evening of November 22, 2008, she was at a family dinner at church with appellant, Wendy Johnson, Richard Johnson, and other family members. Also in attendance was a man named Francisco Ancona, whom Alicia knew as "Brobro," and Gail Barber. At the dinner, Alicia overheard appellant and Ancona talking about "hitting a lick." Although she did not think they were referring to committing a robbery, she knew this term could refer to a robbery. She stated that she thought appellant said the term, but she was "not positive." She stated that, although she did not know what they were referring to, it made her feel "sick" because "anything that has to do with hitting a lick would be somebody getting in trouble." After the dinner, she and appellant returned home with their children in his vehicle. Alicia got into an argument with appellant, and appellant left the home. Alicia began calling appellant on his cellular phone, but he did not answer. Later that night, appellant returned home with Richard Johnson. They were carrying Ancona into the home. Ancona had a cut on his leg, and the two men put him into the shower. Alicia testified that she knew something was wrong because appellant was very upset. Wendy Johnson and Barber also appeared at the home between 3:00 a.m. and 6:00 a.m. Appellant would not tell Alicia what had happened, but later appellant turned on the news, which was broadcasting a story about the victim, and stated, "[T]hat's it."

Alicia Johnson further testified that appellant and appellant's fiancee, Tangia Tobitt,[5] contacted her and attempted to "intimidate" her about testifying. She stated that she was afraid of them. Alicia spoke to Detective Curtis Hafley with the Metropolitan Nashville Police Department about the incident on two occasions, but she gave different statements each time. She said she was scared the first time, and the second time she "felt more comfortable" with Detective Hafley. In her first statement on May 28, 2009, Alicia told Detective Hafley that she was asleep when appellant and the other men came to the home that night, and a loud noise awakened her. However, she did not mention Wendy Johnson and Barber being in the home or that she saw any blood. She gave her second statement to Detective Hafley on March 28, 2010, in which she proffered this additional information. However, she did not tell Detective Hafley about the conversation she overheard between

---

[5] At the time of the incident in November 2008, appellant and Alicia Johnson were married and residing together. Since that time, they have separated and appellant became engaged to Ms. Tobbitt.

appellant and Ancona at the family dinner about "hitting a lick" because she "didn't want to get in trouble." She only revealed that information shortly before trial.

Elizabeth Gail Barber testified that on November 22, 2008, she and her son went to the Walmart parking lot in Madison, Tennessee, to meet appellant, Richard Johnson, and Ancona, whom she knew as "Frank." Wendy Johnson was also at the meeting. Appellant asked Barber if she "wanted to make some money, about a thousand dollars." They wanted to use her vehicle, a Chevrolet S-10 truck, "[g]oing to the robbery." She stated that she followed appellant in his vehicle to a side street off Trinity Lane, where they exchanged vehicles, and she saw appellant remove a gun from the middle console of his vehicle. She stated that she thought "that they were going to use [the gun] to go do the robbery," meaning she thought Ancona was going to take the gun into the home when he committed the robbery. Richard Johnson and Ancona then took her truck "to go by and do the robbery." After Richard Johnson and Ancona took Barber's vehicle, she and Wendy Johnson went with appellant in his vehicle.

Appellant then drove to a White Castle restaurant and waited in the parking lot. Barber heard appellant talking on the phone to someone, asking "if that was gunshots" approximately twenty to twenty-five minutes after the meeting on Trinity Lane. Richard Johnson and Ancona then approached them in Barber's truck, and Ancona got into appellant's vehicle. Appellant drove them to his parents' home, where she saw Alicia Johnson come out on the porch.

Barber further testified that she did not tell Detective Hafley that her two-year-old son was with her that night because she was "afraid that [she] would lose her child." She also told Detective Hafley during her interview that she saw appellant with a gun while at the Walmart parking lot, but she actually saw it on Trinity Lane "[b]ecause after thinking about it, that's where I actually seen [sic] it the first time." She further stated that while at the Walmart parking lot, appellant was sitting in his vehicle with the door open when Ancona, who was standing outside, and appellant agreed that Ancona would be the one to enter the home and commit the robbery.

Detective Paul Harris with the Metropolitan Nashville Police Department testified that he assisted Detective Hafley in the investigation. Approximately eighty-eight hours after the incident occurred, Detective Harris arrested a suspect named Francisco Ancona. At the time of arrest, Ancona told police he was waiting on a ride from appellant, and Ancona gave appellant's address as his place of residence. Detective Harris considered appellant a potential suspect because "there was a fair amount of speculation that someone would have assisted Francisco Ancona in the homicide . . . ." Detective Harris spoke with appellant on November 24, 2010, about his relationship with Ancona. That was appellant's first interview

5

with police concerning this incident. Appellant stated that he took Ancona to an Express Market at approximately 8:30 p.m. on November 22, 2008, and did not have any more contact with Ancona until around noon the next day. Appellant stated that he was sick that evening and had been at home sleeping all night. After the interview, appellant was not placed under arrest and was allowed to leave the station.

Kevin Carroll, an investigator with the Davidson County Sheriff's Office, testified that Ancona's visitation report indicated that appellant visited Ancona in jail seven times between November 30, 2008, and January 25, 2009. Ancona's visitation report also showed that appellant was listed as "sibling." Carroll further testified about Ancona's recorded telephone calls, and he identified five calls that were played for the jury.

Special Agent Richard Wesley Littlehale, Assistant Special Agent in charge of the technical services unit for the Tennessee Bureau of Investigation, testified that Detective Hafley and the District Attorney General's office contacted him to assist in analyzing telephone records pertaining to the case and in preparing a visual aid to present to the jury. He explained the process of collecting and analyzing cellular phone data, and he created a map based on call records and addresses that Detective Hafley provided him.

Detective Curtis Hafley with the Metropolitan Nashville Police Department testified that he was the lead detective in the case and responded to the crime scene at 524 Wesley Avenue at 2:30 a.m. on November 23, 2008. Detective Hafley determined that the rear door of the victim's residence was the point of entry and that George Young's bedroom window was the suspect's point of exit. After the police took Ancona into custody on November 23, 2008, Detective Hafley obtained a search warrant on November 24 for 1221 London Bridge Road because Ancona listed that address as his place of residence. Detective Hafley also obtained Ancona's jail telephone call records and cellular phone records of appellant and Ancona, among other potential suspects.

A few weeks later, a member of the Young family contacted Detective Hafley regarding a letter that Josh Young, the victim's son, had sent. Josh Young was incarcerated in the Cheatham County Jail with Richard Allen, and Allen claimed to have information about the incident. Detective Hafley interviewed Allen at the jail, and Allen supplied Detective Hafley with details about appellant's attempt to get Allen involved in the robbery. Detective Hafley corroborated the information with cellular phone records. Detective Hafley later received recordings of Ancona's telephone calls from prison to appellant. He discovered that from the time of Ancona's arrest on November 23, 2008, and appellant's arrest on January 26, 2009, there were about a dozen calls between Ancona and appellant.

6

Detective Hafley formally interviewed appellant on January 26, 2009, which was appellant's second interview with police. Appellant first told Detective Hafley the same story he told Detective Harris, stating that on the night of the incident he had been sick, had slept all night, and he had not seen Ancona until the next day. As the interview progressed, appellant changed different aspects of his story. At first, appellant denied knowing anything about the incident until after it occurred, but then appellant informed Detective Hafley that Ancona previously told him "he was going to hit a good lick." Appellant then stated that Wendy Johnson contacted him on behalf of a man named Dewayne Vaughan to commit a robbery, but he and Ancona never discussed the robbery. However, when interviewing Vaughan "a day or two" after appellant, Vaughan denied meeting appellant, and no cellular phone records indicated that they had communicated. Later, appellant stated that he, in fact, left his home two times that night to look for Ancona, who had called him wanting a ride. However, appellant's story of the events did not correlate with cellular phone records and other statements, and Detective Hafley confronted appellant about the inconsistencies. Appellant later stated that he spoke to Allen about recruiting him to commit the robbery. He said that he drove to Allen's house with Richard Johnson and Ancona, where Ancona attempted to recruit Allen to participate.

Approximately three hours into the interview, appellant added that Richard Johnson and Ancona drove Barber's truck to commit the robbery. After claiming he was at his home when the robbery happened, appellant subsequently stated that he was, in fact, out driving by himself at the time of the robbery. Approximately four hours into the interview, appellant admitted that he went to the Youngs' home the first time with Richard Johnson and Ancona under the pretext that a man named "Dewayne" sent them in an attempt to get money. Appellant stated that he took Richard Johnson and Ancona to a church behind the Youngs' residence, and he waited in his vehicle while the other two men went up to the home. Appellant agreed with Detective Hafley that had the first attempt gone as planned, he would have been the "getaway driver." Appellant also stated to Detective Hafley that he was not going to get anything from the robbery and that he did not want any money. Detective Hafley further testified about the time and location of calls made by appellant and Ancona using cellular phone records.

Sandra Parrish Thomas, M.D., an assistant medical examiner for the Davidson County Medical Examiner's Office, testified that she reviewed the autopsy of the victim, although she did not conduct the autopsy herself. She testified that the victim died from a single gunshot wound to the head.

Appellant, Steven Woodrow Johnson, testified that he was not truthful with police in his interviews because he had received a threatening telephone call warning him not to testify against Ancona. The telephone call caused him to fear for the safety of his family. He stated

7

that by the end of his interview with Detective Hafley, however, he had told the detective everything he knew about the incident. Appellant testified that two weeks prior to the incident, Wendy Johnson took him to meet Dewayne Vaughan, who wanted him to participate in a robbery, but appellant said he was not interested. Appellant denied having a conversation with Ancona at the family dinner the night of the incident about "hitting a lick." Appellant testified that Ancona asked him to take him and appellant's brother, Richard Johnson, to buy marijuana that night. Ancona directed them to an area close to 524 Wesley Avenue, although appellant did not know a robbery was going to be attempted at that time. Appellant testified that he learned that his brother and Ancona actually made the first robbery attempt after the robbery attempt had occurred.

Appellant further denied having a gun in his truck the night of the robbery and stated that he never saw anyone with a gun that night. However, he stated that he heard Ancona and Allen talking about a gun while the two men were seated in the back of his vehicle. Appellant admitted that he placed the telephone call to Allen after the first failed robbery attempt, but he stated he handed the telephone to Ancona after Allen answered because Ancona did not have a phone or any other way of getting in touch with Allen. Appellant testified that after the failed attempt, he drove Richard Johnson and Ancona to meet with Allen at the Taylor residence. He admitted he was in the car the entire time that Allen and Ancona were talking about "hitting a lick" and "needing a strap." However, appellant stated that he was not aware that Ancona was planning to return to the Youngs' residence to attempt the robbery again that night.

Appellant testified that he was aware Ancona was going to commit a robbery on the evening of November 22, but he did not know when or where. He admitted driving over to the house of a man named "Red," but he denied knowing that Ancona was attempting to recruit him to participate in the robbery. Appellant was aware that his brother, Richard, had driven Ancona to the Young residence to commit the robbery and that Ancona killed the victim, but appellant only learned of this after the incident had occurred. Appellant further admitted that on the day of the incident, Ancona came back to his house injured during the early morning hours.

After hearing the evidence, the jury convicted appellant of first degree felony murder, especially aggravated burglary, aggravated burglary, aggravated assault, and possession of a firearm during the commission of a dangerous felony. The trial court merged the convictions for especially aggravated burglary and aggravated burglary but entered a separate judgment for each of those counts. Appellant filed a timely motion for a new trial, which the trial court heard on March 10, 2011. The trial court denied appellant's motion for a new trial, which resulted in the present appeal.

8

## II.  Analysis

### A.  Sufficiency of the Evidence

Appellant contends that the evidence was insufficient to support his convictions for felony murder and the other underlying felonies.  Appellant's sufficiency argument rests upon his contentions that the State's witnesses were not credible and that there was no physical evidence tying him to the victim or the crime scene.  The State argues that the evidence was sufficient.  We agree with the State.

The standard for appellate review of a claim of insufficiency of the State's evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e); *see State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011).  To obtain relief from a claim of insufficient evidence, appellant must demonstrate that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt.  *See Jackson*, 443 U.S. at 319. This standard of review is identical whether the conviction is predicated on direct or circumstantial evidence, or a combination of both.  *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977).

On appellate review, "we afford the prosecution the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom." *Davis*, 354 S.W.3d at 729 (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)); *State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978).  In a jury trial, questions involving the credibility of witnesses and the weight and value to be given the evidence, as well as all factual disputes raised by the evidence, are resolved by the jury as trier of fact.  *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990).  This court presumes that the jury has afforded the State all reasonable inferences from the evidence and resolved all conflicts in the testimony in favor of the State; as such, we will not substitute our own inferences drawn from the evidence for those drawn by the jury, nor will we re-weigh or re-evaluate the evidence.  *Dorantes*, 331 S.W.3d at 379; *Cabbage*, 571 S.W.2d at 835; *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).  Because a jury conviction removes the presumption of innocence that appellant enjoyed at trial and replaces it with one of guilt at the appellate level, the burden of proof shifts from the State to the convicted appellant, who must demonstrate to this court that the evidence is insufficient to support the jury's findings. *Davis*, 354 S.W.3d at 729; *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

First, appellant asserts that the evidence against him was insufficient to support his convictions because of the lack of credibility of the State's witnesses. Specifically, appellant points to the inconsistencies in the statements given to police by the State's witnesses. Appellant points to the admission of Alicia Johnson that she was not truthful with police during her first interview. Further, appellant highlights the fact that Richard Allen was incarcerated in Cheatham County Jail at the time he contacted the victim's family and police. Allen's interview with Detective Hafley, while he was incarcerated, concerning appellant's attempt to recruit Allen ultimately led to Detective Hafley's interview with appellant. Appellant asserts that the benefits Allen could receive in exchange for his testimony motivated his willingness to help police and testify against appellant, undermining Allen's credibility. Appellant also points to the inconsistent statements given by Barber to police and the fact that the police never charged her for the crime, despite the fact she knowingly allowed Ancona and Richard Johnson to use her truck during the second robbery attempt.

Notwithstanding appellant's contentions, the credibility of witnesses and their testimony is not decided by this court on appeal. To the contrary, the determination of the credibility of witnesses is made by the jury as the trier of fact. *See Bland*, 958 S.W.2d at 659; *Pruett*, 788 S.W.2d at 561. The jury was entitled to discredit appellant's testimony that minimized both his knowledge of the crime before it took place and his involvement in the crime. Likewise, the jury was entitled to accredit the testimony of the State's witnesses to conclude appellant was associated with Ancona and the other participants in planning the crime with the intent that Ancona would carry out the crime.

Appellant further supports his insufficiency argument by pointing to the lack of physical evidence linking appellant to the victim and the crime. However, as the State asserts, the fact that appellant was not physically present during the home invasion, resulting in a lack of physical evidence, is immaterial to his conviction of felony murder and the underlying felonies due to his criminal responsibility for the actions of Ancona.

"A person is criminally responsible as a party to an offense if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." Tenn. Code Ann. § 39-11-401(a) (2006). Further, a person is criminally responsible for an offense committed by the conduct of another, if "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]" Tenn. Code Ann. § 39-11-402(2) (2006). While not a separate crime, criminal responsibility is a theory by which the State may alternatively establish guilt based on the conduct of another. *Dorantes*, 331 S.W.3d at 386 (citing *State v. Lemacks*, 996 S.W.2d 166, 170 (Tenn. 1999)). No specific act or deed needs to be demonstrated by the State, and, furthermore, the presence and companionship of an accused with the offender

10

before and after the offense are circumstances from which participation in the crime may be inferred. *State v. Ball*, 973 S.W.2d 288, 293 (Tenn. Crim. App. 1998). However, to be convicted, "the evidence must establish that the defendant in some way knowingly and voluntarily shared in the criminal intent of the crime and promoted its commission." *Dorantes*, 331 S.W.3d at 386 (citing *State v. Maxey*, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994)); *State v. Foster*, 755 S.W.2d 846, 848 (Tenn. Crim. App. 1988)).

Viewed in the light most favorable to the State, the evidence presented at trial supports appellant's convictions, and a rational trier of fact could conclude beyond a reasonable doubt that he acted in concert with Ancona in planning the robbery of John and George Young, which resulted in Ancona killing the victim after breaking into their home. Although appellant testified that he did not recall making many of the statements while he was testifying, Detective Hafley testified that appellant admitted his involvement in the first attempt at the robbery, including that he would have been the "getaway driver" had everything gone according to plan. Further, Alicia Johnson testified that she heard appellant and Ancona having a conversation about "hitting a lick," and appellant later directed her to a news broadcast about the incident when she was asking about what happened that night. Allen testified that appellant attempted to recruit him to commit the robbery. Also, Barber stated during her testimony that appellant approached her about using her truck in exchange for money, understanding that it was going to be used for the robbery, and she was with appellant, Richard Johnson, and Ancona while they were devising the plan for the robbery. Barber further stated that she saw appellant in his vehicle with a gun, and she believed that Ancona was going to use the gun to commit the robbery. She also heard appellant talking on the phone to someone shortly after the other two men took her truck, asking "[i]f that was gunshots" while she and appellant were waiting on Richard Johnson and Ancona. Further, analysis of cellular phone records belonging to appellant and Ancona corroborated the testimony of State's witnesses.

Based on our review of the evidence, we conclude that the evidence was sufficient to support appellant's convictions beyond a reasonable doubt. The testimony of the State's witnesses established evidence from which a jury could determine appellant's involvement in the planned robbery beyond a reasonable doubt. He is entitled to no relief.

## B. Modification

Although appellant did not raise this issue in his brief, the State asserts that appellant's conviction for especially aggravated burglary should be modified to aggravated burglary. "When necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal." Tenn. R. App. P. 36(b); *see also*

Tenn. R. App. P. 13(b) (stating that the appellate court may in its discretion consider other issues not raised on appeal to prevent prejudice in the judicial process, among other reasons). Under Tennessee Code Annotated section 39-14-404(d), the State contends that appellant's conviction of felony murder precludes his conviction of especially aggravated burglary because the act of killing the victim constituted the "serious bodily harm" element of appellant's especially aggravated burglary conviction.

Tennessee Code Annotated section 39-14-404 sets out the offense of especially aggravated burglary, which is the burglary of a habitation where the victim suffers serious bodily injury. Tenn. Code Ann. § 39-14-404 (2006). The statute continues, "Acts which constitute an offense under this section may be prosecuted under this section or any other applicable section, but not both." Tenn. Code Ann. § 39-14-404(d) (2006). Convictions of both especially aggravated burglary and another offense resulting from the same act is precluded by this statute, and, thus, the State cannot use the same act to prosecute an accused for both especially aggravated burglary and another offense. *See State v. Holland*, 860 S.W.2d 53, 60 (Tenn. Crim. App. 1993) ("[S]ubsection (d) prohibits using the same act to prosecute for especially aggravated burglary and another offense.").

The record reflects that the jury convicted appellant of count one of the indictment for the felony murder of John Young. Additionally, appellant was convicted of count two of the indictment for especially aggravated burglary, in which John Young was also the named victim. In both counts, the serious bodily injury of victim John Young was listed as an element of the offense. Because the specific act of killing the victim also constituted the "serious bodily injury" suffered by the victim, enhancing the burglary offense to especially aggravated burglary, "[s]ubsection (d) proscribes the prosecution and conviction for especially aggravated burglary." *State v. Oller*, 851 S.W.2d 841, 843 (Tenn. Crim. App. 1992); *see also State v. Michael Dean Marlin*, No. M2011-00125-CCA-R3-CD, 2011 WL 5825778, at *14 (Tenn. Crim. App. Nov. 17, 2011) (holding that the "effect of subsection (d) is that the Defendant cannot be convicted of especially aggravated burglary and aggravated robbery when the serious bodily injury of [the victim] was an element of both offenses"); *State v. James Anthony Burgess*, No. M2009-00897-CCA-R3-CD, 2010 WL 3025524, at *7 (Tenn. Crim. App. Aug. 4, 2010); *State v. Jonathan Lee Adams*, No. E2008-00400-CCA-R3-CD, 2009 WL 2176577, at *9 (Tenn. Crim. App. July 22, 2009). This court has held that a conviction for both especially aggravated burglary and murder cannot stand because the killing of another is "serious bodily injury" under this statute. *See Oller*, 851 S.W.2d at 843. When such a conviction has occurred, the proper action is to modify the conviction for especially aggravated burglary to aggravated burglary as a lesser-included offense. *See Holland*, 860 S.W.2d at 60; *Oller*, 851 S.W.2d at 843. Therefore, appellant's conviction for especially aggravated burglary, a Class B felony, is precluded by statute and should be modified to a conviction for aggravated burglary, a Class C felony.

At the sentencing hearing on July 22, 2010, the trial court merged appellant's conviction for aggravated burglary with the conviction for especially aggravated burglary, sentencing appellant to a period of ten years. However, the conviction for especially aggravated burglary under count two should be reduced to a conviction for aggravated burglary and merged with the conviction of aggravated burglary under count four. Consequently, appellant's sentence should be modified to the five-year sentence imposed by the trial court for appellant's conviction of aggravated burglary under count four of the indictment. *See State v. Daniel O'Sicky*, No. E2010-02439-CCA-R3-CD, 2011 WL 3371486, at *7 (Tenn. Crim. App. Aug. 5, 2011) ("Accordingly, we impose a sentence of six years for the modified conviction because the trial court imposed the maximum sentence for each of the Defendant's other convictions."); *State v. Jonathan Lee Adams*, No. E2008-00400-CCA-R3-CD, 2009 WL 2176577, at *9 (Tenn. Crim. App. July 22, 2009) ("Given that the trial court imposed a minimum sentence of eight years for the defendant's especially aggravated burglary conviction, on remand we instruct the trial court to enter a three-year sentence for the defendant's aggravated burglary conviction."); *State v. Larry Darnell Pinex*, No. M2007-01211-CCA-R3-CD, 2008 WL 4853077, at *17 (Tenn. Crim. App. May 11, 2009) (imposing a modified mid-range sentence consistent with the trial court's other sentences). Accordingly, appellant's conviction of count two for especially aggravated burglary must be modified to aggravated burglary. Thus, we remand for modification of the judgment form to reflect a judgment for aggravated burglary and sentence of five years on count two.

In addition, the trial court should have entered only one judgment of conviction with respect to the counts of especially aggravated burglary and aggravated burglary. *See State v. William F. Cartwright*, No. M2003-00483-CCA-R3-CD, 2004 WL 1056064, at *6 (Tenn. Crim. App. May 10, 2004). Thus, we vacate the judgments for counts two and four and remand the case for entry of a single judgment of conviction on those two counts consistent with this opinion.

## CONCLUSION

Because appellant's conviction of especially aggravated burglary is precluded by statute, we conclude that the conviction of especially aggravated burglary should be modified to aggravated burglary. We vacate the judgments in count two and count four and remand to the trial court for entry of a single judgment of conviction consistent with this opinion. We affirm the judgments of the trial court in all other respects.

_____

ROGER A. PAGE

13